# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Norfolk Division

KIRBY B. B.,[1]

Plaintiff,

v.                                                ACTION NO. 2:22cv115

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

Defendant.

## UNITED STATE MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Kirby B. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security Administration ("SSA") denying her claim for benefits under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 8. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF No. 10) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 12) be **GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

## I.    PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits on February 7, 2020, alleging disability beginning January 1, 2019, because of a stroke, a heart condition, migraine headaches, short-term memory loss, depression, anxiety, and endometriosis.[2]  R. 15, 18, 68–69, 173–74.  Plaintiff's date last insured for purposes of disability insurance benefits is December 31, 2023.  R. 68.

After denial of her benefits claim both initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 68–82, 85–96.  ALJ Jeffrey Jordan heard the matter on March 22, 2021, and issued a decision denying benefits on May 6, 2021.  R. 15–29, 35–67.  On January 14, 2022, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–5.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on March 11, 2022.  ECF No. 1.  The Commissioner answered on July 1, 2022.  ECF No. 6.  The parties filed motions for summary judgment, with supporting memoranda, on July 29 and August 29, 2022, respectively.  ECF Nos. 10–13.  Plaintiff filed a reply brief on September 19, 2022.  ECF No. 14.  Absent special circumstances requiring oral argument, the case is deemed submitted for a decision.

## II.    RELEVANT FACTUAL BACKGROUND

Plaintiff argues that the ALJ erred in declining to credit the opinions of her cardiologist, Dr. Lloyd Kellam.  This resulted, plaintiff asserts, both from the ALJ's failure to consider the support for Dr. Kellam's opinions and from the ALJ's classification of them as inconsistent with

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

other medical evidence based on a selective review of the record. Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 11, at 10. The Court's review of the facts below is tailored to such arguments.

## A.  *Background Information and Hearing Testimony by Plaintiff*

Plaintiff testified by telephone before ALJ Jordan on March 22, 2021. R. 37–38. At that time, she was 36 years old, and living with her husband, a teenage son, and a three-year-old daughter. R. 41–42. Plaintiff is a high school graduate. R. 43.

Before stopping work in early 2019 due to her conditions, R. 173, 184–85, plaintiff recently worked as a student support monitor or teacher's aide for approximately three years, and before that as a waitress and hostess for almost eight years, R. 44–47.

Plaintiff testified that her health deteriorated after her pregnancy in 2017 and following two strokes in 2017 and 2019. R. 42, 44, 51, 57 (stating that she previously did "everything on [her] own"). She has severe migraine headaches, heart problems and tachycardia, post-stroke problems, anxiety, depression, and recently underwent a partial hysterectomy and removal of an ovarian cyst. R. 47, 50–51, 55–56, 58–59.

Plaintiff's migraine headaches occur every couple of days and can last as long as a week. R. 48. Although unable to identify triggers and noting that the headaches date back to childhood, plaintiff reports that they returned "with a vengeance" after her daughter's birth and are worsened by "a lot of sounds and lights." R. 48–49. When experiencing a headache, plaintiff postpones other tasks, including housework, and lays down or engages in quiet activities with her daughter. R. 49 (enlisting help from family during severe headaches). To treat this condition, plaintiff takes a monthly injection, also receives Botox injections every three months, uses "dissolvable tabs" placed under the tongue, takes Tylenol or ibuprofen, uses icepacks and heating pads, and recently

3

began using a new prescription medication.  R. 47–49 (noting that combined monthly injections and Botox treatments were "not helping alone").

With respect to her heart condition, plaintiff reports having an Ebstein's anomaly[3] and tachycardia.  R. 50.  To monitor these conditions, plaintiff has a "loop recorder planted in [her] chest that monitors [her] heart 24/7 for . . . tachycardia."  R. 47.  She also has undergone three ablation procedures to help regulate her heart's electrical activity.  R. 50.  She also describes having a hole in her heart, which doctors apparently hope to close in two years.  *Id.*  She experiences shortness of breath a couple of times a week and feels really tired due to episodes of palpitations. R. 45, 50–51, 56; *see also* R. 43 (noting also a substantial weight gain after recent surgeries).

Plaintiff identifies two primary effects from her strokes, which doctors have said may also play a role in her headaches.  R. 51.  First, she is forgetful and has trouble remembering what she is doing around the house and has forgotten to turn off the oven.  R. 47–48, 58.  Also, plaintiff has missed "quite a few" doctors' appointments, in spite of having calendared them.  R. 57–58. Second, she occasionally has persistent numbness in her right hand and arm up to the neck and shoulder.  R. 51–54 (noting a pending appointment for an EMG study).  Plaintiff, who is right-handed, describes that hand as "weak" and reports recent problems with gripping items, typing, and holding and using a pen or pencil.  R. 43, 54–55 (dating the start of such problems to January 2021).

Plaintiff also testified that anxiety causes her to be very "hyper" and "high strung," that she excessively worries and broods over worse-case scenarios, and that her equanimity is easily

---

[3] An Ebstein's anomaly is a congenital heart condition in which the tricuspid valve does not function properly due to mal-location and malformation of valve flaps.  *See https://www.mayoclinic.org/diseases-conditions/ebsteins-anomaly/symptoms-causes/syc-20352127* (last visited April 25, 2023).

disrupted by unanticipated events. R. 55.  When depressed, plaintiff lacks the desire to dress or engage in other tasks of daily living.  *Id.*  Also, following a recent partial hysterectomy, plaintiff reports feeling "real antsy" and having severe crying episodes. R. 58.

Plaintiff is licensed and drives to the store to buy groceries and to other appointments, and is typically accompanied by her husband. R. 42.  When driving more than 30 minutes, plaintiff makes numerous stops due to swelling and her need to get up and move about after sitting too long. R. 42–43.

Plaintiff performs household chores, such as cleaning, vacuuming, laundry, and washing dishes. R. 56.  However, she takes breaks and "rest[s] a lot" to catch her breath. *Id.*  Also, because of her conditions and unlike before 2019, she now relies on her husband's daily help with most household tasks. R. 49–50, 56–57.  Plaintiff also remains able, with breaks as needed, to engage in personal care tasks, such as bathing and dressing. R. 56–57.

### B.    *Hearing Testimony by Vocational Expert*

George Starosta, a vocational expert ("VE"), also testified. R. 59–64, 236–38.  VE Starosta classified plaintiff's past employment as a teacher's aide/assistant, and as a server, as light, semi-skilled work. R. 59.  In response to the ALJ's hypothetical[4], VE Starosta testified that such a person could not perform plaintiff's past relevant work. R. 60–61.  VE Starosta also testified that

---

[4] The hypothetical prescribed no more than sedentary work and was premised on a person of plaintiff's age, education, work history, and RFC who:  (1) must avoid climbing ladders, ropes, and scaffolds, but is able to perform other postural movements occasionally; (2) is limited to performing tasks that are simple, routine, and low stress (meaning they involve work with no more than occasional changes in routine and work that permits avoidance of fast-paced tasks like assembly-line jobs with production quotas); (3) is limited to occasional interaction with coworkers and the public; (4) is limited to frequent fingering, grasping, handling, and reaching bilaterally; (5) who must avoid brightly lit and noisy work environs; (6) must avoid hazards such as moving, dangerous machinery, and unprotected heights; and (7) must avoid concentrated exposure to airborne irritants and environmental weather extremes. R. 60–61.

such a person could work at unskilled, sedentary jobs such as a mail sort clerk/addresser, toy stuffer, and surveillance system monitor. R. 62.

In response to questions from plaintiff's attorney, VE Starosta testified that all competitive employment would be foreclosed if the hypothetical person were to be off task for 15% or more of each workday. R. 63. He also testified that adding a limitation for occasional use of the hands would eliminate the mail sort clerk/addresser and toy stuffer jobs, but work as a surveillance system monitor would remain. R. 63–64. Finally, VE Starosta agreed that this latter job would be "really problematic" if a worker were to be off task 10% of each workday, due to the careful attention required by the job. R. 64.

## C.    *Relevant Medical Record*

### 1.    *Treatment at Riverside Shore Memorial Hospital and Riverside Regional Medical Center*

On November 10, 2017, plaintiff underwent a cesarian section, tubal ligation, and gave birth to her daughter at Riverside Shore Memorial Hospital ("Riverside Shore"). R. 261, 266. After her discharge, plaintiff returned to the emergency department on November 19, 2017, with a fever and lower abdominal pain. R. 261. Examination revealed an infected wound and plaintiff underwent surgical debridement and packing, and treatment with vacuum-assisted closure of the wound. R. 247, 261, 266. Plaintiff remained hospitalized and on November 22, 2017, she experienced heavy, delayed, postpartum bleeding. R. 247, 263. This required blood transfusions and emergent dilatation and curettage to stop the bleeding. R. 263.

While in a post-anesthesia care unit, plaintiff developed "acute onset left[-]sided weakness" and was diagnosed with a right middle cerebral artery thrombosis. R. 248, 254. This emergency necessitated a medevac transfer to the Riverside Regional Medical Center ("Riverside Regional"). R. 254, 263. There plaintiff underwent a "successful suction thrombectomy," which

6

removed a clot from a branch of her cerebral artery.  R. 247, 255, 260.  This led to immediate resolution of plaintiff's "deficits . . . and her NIH stroke score remained 0."[5]  R. 263; *see* R. 247 (noting "a complete neurologic recovery").

On November 27, 2017, Riverside Regional discharged plaintiff but on the trip home she again experienced heavy vaginal bleeding and returned to the emergency department at Riverside Shore.  R. 247.  After several days of in-patient treatment, including blood transfusions, failed to resolve her "recurrent profuse vaginal bleeding," plaintiff was transferred back to Riverside Regional.  R. 247, 254.  Upon arrival, she underwent a uterine artery embolization procedure, which failed to staunch the bleeding, followed by an emergency supracervical hysterectomy on November 30, 2017.  R. 254.  This resolved the bleeding and plaintiff "recovered well postoperatively," as her hemorrhagic shock resolved over several days. R. 250, 254.  Plaintiff was finally discharged on December 5, 2017.  R. 265.

Heart testing after plaintiff exhibited stroke symptoms revealed a patent foramen ovale ("PFO"), which led doctors to identify the cause of the stroke as a "paradoxical embolism."  R. 263 (referencing echocardiogram).  Discharge instructions directed "follow up with a cardiologist for a diagnosis of [PFO]."  R. 256.

On November 11, 2018, plaintiff received treatment at Riverside Shore for chest and back pain and a headache.  R. 509–10.  An examination yielded mostly normal findings, except for sternal and mid-thoracic paravertebral muscle tenderness.  R. 511.  After an EKG and troponin testing yielded normal results, plaintiff was discharged.  R. 512.

---

[5] The National Institutes of Health stroke scale is used to evaluate any deficits and effects of a stroke based upon scores from a 15-item neurological examination. *See https://www.stroke.nih.gov/documents/NIH_Stroke_Scale_Booklet_508C.pdf* (last visited April 25, 2023).  A score of 0 corresponds with the absence of stroke symptoms.

On January 2, 2021, plaintiff went to Riverside Shore's emergency department complaining of numbness and tingling in her right upper extremity from the shoulder to the fingers. R. 670; *see* R. 679–80 (reporting that she initially presented with a "very high level of anxiety almost to the extent of panic," that subsided by the next day). A brain MRI showed evidence of her prior stroke, but "no acute infarct." R. 671–72. CT scans of plaintiff head and neck yielded results "within normal limits," resulting in plaintiff's inpatient referral for a possible transient ischemic attack ("TIA"), rather than a stroke. R. 670; *see* R. 673 (but noting advanced global cerebral atrophy, given plaintiff's age). Chest x-rays revealed no acute cardiopulmonary process. R. 676. After unremarkable and repeated neurologic exams and because plaintiff's symptoms resolved after 24 hours without any deficits, she was discharged on January 4, 2021, with diagnoses of hyperlipidemia, TIA, and depression with anxiety. R. 668.

### 2. *Treatment with Lloyd J. Kellam III, M.D., and Robert Paschall, D.O., at Riverside Eastern Shore Physicians and Surgeons*

In or about 2018, plaintiff began treatment with Dr. Lloyd Kellam, a cardiologist. R. 544. On February 13, 2018, plaintiff complained to Dr. Kellam of chest pain and dyspnea upon exertion. R. 545–46 (describing anxiety due to persistent, non-radiating, "vague chest pain . . . of moderate intensity"). The treatment notes reviewed the medical history from December 2017 to February 2018 and reflect that, aside from "mild memory disturbance" plaintiff had "no further neurologic deficits" following removal of the aforementioned blood clot. R. 545. The notes also refer to prior treatment at the Sentara Structural Heart Clinic, which identified plaintiff as having an Ebstein's anomaly of the tricuspid valve, as well as a PFO (a hole between heart chambers that fails to close after birth).[6] *Id.* As discussed below, plaintiff underwent a successful procedure to close the hole

---

[6] Records from Sentara Heart Hospital dated January 15, 2018, indicate that plaintiff was diagnosed with Ebstein's anomaly as a child at Johns Hopkins, had periodic episodes of

with a Gore septal occluder. *Id.*

Dr. Kellam's examination on February 13, 2018 revealed, among other things, the absence of chest wall tenderness, a regular pulse, a resting blood pressure of 130/74, a regular heart rate, no significant edema, and a "grade 2 holosystolic murmur of tricuspid regurgitation." R. 547. Dr. Kellam ordered an EKG and described the results as "unremarkable." *Id.* An echocardiogram also found the septal closure device in good position, as well as "evidence of [Ebstein's] anomaly with a low lying tricuspid valve and moderate tricuspid regurgitation." R. 543–45, 547. Dr. Kellam assessed plaintiff's chest pain as "atypical" and possibly related to anxiety "about matters in general," noted she "look[ed] quite good," prescribed 40 pills of Tramadol, recommended hot soaks, and directed her to report back about her condition in two days. R. 547 (also directing plaintiff not to take Tramadol and Xanax together).

On March 7, 2018, Robert Paschall, D.O., treated plaintiff for reported memory loss and anxiety.  R. 538–41; *see* R. 540 (noting complaints of "confusion, decreased concentration, dysphoric mood and sleep disturbance" and describing patient as "nervous/anxious and . . . hyperactive").  An examination yielded mostly normal findings, but noted that anxiety may be causing memory loss and associated lack of concentration and attention. R. 540 (also noting "[s]tance gait fine motor sensory and cerebellar exams are normal [and patient] is not hyperreflexic"). Dr. Paschall ordered a brain MRI and prescribed Lorazepam as a longer-acting substitute for Xanax. R. 538, 540–41; *see* R. 537–38 (increasing the Lorazepam dosage several days later after plaintiff reported it as ineffective).

---

supraventricular tachycardia prior to age three, which did not recur until she became a teenager. R. 332–33. As a teenager, plaintiff underwent a series of apparently successful cardiac ablations to treat the heart's electrical function. R. 333. Plaintiff's PFO was diagnosed at the time of the ablations, but apparently her cardiac issues did not resurface until the 2017 pregnancy. *Id.*

On July 11, 2018, plaintiff received treatment from Angelica Perry, D.O., in Tangier, VA. R. 524. Plaintiff said that she felt "zoned out," suffered from "the worst headache" of her life, and left work after feeling out of sorts and having difficulty understanding others. *Id.* During Dr. Perry's examination, plaintiff appeared confused, had trouble understanding, and intermittently slurred her words. R. 524, 526. Although suspecting a urinary tract infection, Dr. Perry sent plaintiff for emergency hospital transport due to the prior stroke. R. 527.

After treatment and release from Salisbury Hospital, plaintiff saw Dr. Paschall on July 13, 2018. R. 521. His notes reflect that hospital MRIs suggested a possible brain tumor at the location of the plaintiff's prior blood clot and he sent the MRIs to neurosurgical experts for review. R. 521, 524. A systems review was negative, except for plaintiff's reports of speech problems and headaches. R. 523. Dr. Paschall's examination yielded normal results, except for plaintiff's mental status being "a little on the high side." *Id.* Dr. Paschall assessed that plaintiff had a seizure/ generalized nonconvulsive seizure, ordered an EEG, provided epilepsy counseling, and prescribed two drugs on "the chance that these are seizures." R. 523–24. The EEG results were normal. R. 520. A September 14, 2018 follow-up visit with Dr. Paschall was unremarkable. R. 516–19.

On September 20, 2018, Dr. Paschall injected Depakote into plaintiff's occipital nerves to treat and relieve reported bilateral occipital headaches. R. 513–16 (finding "some tenderness to palpitation over both greater occipital nerves at the skull base").

On April 15, 2019, Riverside Shore's emergency department treated plaintiff for worsening chest pain and tightness, shortness of breath, and swelling in her lower legs. R. 499 (noting plaintiff's concern over "congestive heart failure"). An examination by Dr. Kellam showed a normal heart rhythm and pulse, but also "gallop and S3" and the presence of a heart murmur. R. 501. Plaintiff had a normal mood and affect and an alert neurological status. *Id.* A chest x-ray

10

showed slightly hypoinflated but clear lungs, with no acute cardiopulmonary process. R. 502. Dr. Kellam issued no prescriptions, but ordered that plaintiff consult with her Norfolk cardiologist and check back in a couple of days. *Id.* Dr. Kellam diagnosed severe tricuspid regurgitation and shortness of breath upon exertion. R. 503.

Plaintiff underwent a cardiac catheterization procedure at Sentara Norfolk General Hospital in or about June 2019. R. 494, 498. Dr. Kellam characterized the results as "favorable," with "stable right heart pressures, decent cardiac output, and angiographically normal coronary arteries." R. 494. An echocardiogram also showed "stable tricuspid regurgitation." *Id.* In light of these findings, on October 21, 2019, Dr. Kellam recommended implantation of a loop recorder "to assess for occult atrial fibrillation or flutter." *Id.* During a systems review, plaintiff reported shortness of breath, dyspnea on exertion, depression, nervousness, and anxiety. R. 496. An examination yielded mostly normal cardiovascular, neurological, and psychiatric results, other than a grade 2/6 holosystolic murmur likely from tricuspid regurgitation, and occasional brief pulsations. R. 497. Dr. Kellam assessed plaintiff as "doing relatively well" overall, but said that the loop recorder would help assess whether a cardiac arrhythmia played a role in any neurologic spells. R. 494, 497. On October 23, 2019, Dr. Charles Goldstein surgically installed a loop recorder in plaintiff's chest. R. 488–92.

On November 8, 2019, plaintiff returned to see Dr. Kellam. R. 483. Examination findings were similar to her last visit. R. 485. Recorder data revealed "no significant arrhythmias" post-implantation. *Id.* Dr. Kellam planned to follow the recorder results every three months and recommended annual echocardiograms to monitor plaintiff's Ebstein's anomaly, which otherwise required no intervention. R. 486.

On February 10, 2020, plaintiff complained to Dr. Kellam about continuing dyspnea upon exertion. R. 477–78. Dr. Kellam's notes reflect a search for the cause of that condition and based on echocardiogram results, discounted any link to the closing of plaintiff's PFO. R. 477–78 (finding such a cause unlikely, but still "a consideration"). In a systems review, plaintiff reported, among other things, malaise, fatigue, weight gain, dyspnea upon exertion, mild leg swelling, shortness of breath, musculoskeletal stiffness, neurological paresthesia and weakness, and nervousness and anxiety. R. 479–80. An examination found, among other things, a heart murmur, minimal swelling, and mild anxiety, but was otherwise normal. R. 480. Dr. Kellam reviewed the "favorable" results of recent echocardiograms and loop recorder data. R. 480–82. As for the latter and in spite of "a few episodes of tachycardia," particularly in January 2020, Dr. Kellam found "no major issues" and noted that the cause of the palpitations remained unknown. R. 481; *see* R. 482 (discussing possible use of a beta-blocker if plaintiff has lots of palpitations). Dr. Kellam also found plaintiff's cardiac outputs to be "relatively normal although perhaps low normal," with satisfactory ventricular function, and assessed chronic dyspnea with Ebstein's anomaly of the tricuspid valve. R. 482. Dr. Kellam recommended seeing a specialist at Johns Hopkins to evaluate the extent of tricuspid regurgitation and its role, if any, in plaintiff's dyspnea. *Id.*

On November 12, 2020, plaintiff complained to Dr. Kellam about some soreness and "feelings of dysesthesia," around her implanted loop recorder. R. 725. In recounting plaintiff's history, Dr. Kellam noted the presence of some sinus tachycardia, but none related to her earlier ablations. *Id.* (noting also the absence of "atrial fibrillation . . . or flutter"). He discussed the results of the referral to Johns Hopkins and the specialist's (Dr. Tom Trail) findings of a "very mild" Ebstein's anomaly with "no major functional impairment" and a closed PFO with no "active arrhythmias in need of intervention." *Id.* Dr. Kellam noted plaintiff continued to take Xanax for

anxiety, without abusing the same, and her anxiety was "well controlled." *Id.* Dr. Kellam also observed that plaintiff has "done well . . . with only mild dyspnea on exertion, no orthopnea, no [paroxysmal nocturnal dyspnea,] no syncope, [or] presyncope," and has had no other strokes or TIAs. *Id.*

Notwithstanding these observations, plaintiff complained, among other things, about malaise, fatigue, eye pain, dyspnea upon exertion, mild palpitations, arthritis, and neurological paresthesias and sensory changes.  R. 727–28.  An examination found that the implant site "look[ed] fine" and was otherwise normal, except for noting moderate obesity and "bogginess without severe edema."  R. 728.

Plaintiff next saw Dr. Kellam on February 4, 2021 and this appointment yielded similar findings as the last. R. 716.  Plaintiff voiced similar complaints, as well as about forgetfulness and problems with remembering things, concentration, and performing all activities of daily living without assistance. R. 719.  In discussing the cardiovascular complaints, Dr. Kellam described her symptom as "mild . . . at present," with "plenty of dyspnea on exertion and . . . occasional palpitation"; "none [of which is] disabling."  *Id.*  An examination again yielded mostly normal results, except for some weight gain, some "bogginess around the ankles," and moderate anxiety that Dr. Kellam attributed to plaintiff's health issues.  R. 720.  His review of loop recorder data revealed "some periods of atrial tachycardia but nothing ominous" and "some sinus tachycardia," but noted that plaintiff's rhythm was controlled with medication.  R. 716; *see also* R. 720.  Dr. Kellam reported that plaintiff has "done well overall" and scheduled her for a follow-up appointment in six months or sooner.  R. 716, 724.

### 3. *Medical Source Statement from Dr. Kellam*

On February 7, 2021, Dr. Kellam completed a medical evaluation report listing plaintiff's impairments as Ebstein's anomaly, multiple supraventricular tachycardia events, and a cerebrovascular accident, and reported her prognosis as fair. R. 709–11. Dr. Kellam specified no observations, findings, and tests supporting his diagnoses, stating that they were too numerous to list on the form. R. 709. He checked next to "Yes," when asked if fatigue "would affect the patient's **concentration/memory and cause inability to focus and stay on task in a work setting**" and specified that this would occur 50% of the time every day and week. *Id.* He checked next to "No" when asked if plaintiff needed bedrest due to fatigue that would prevent periodic reporting to work. *Id.* When asked whether extra rest breaks were required due to fatigue such that plaintiff would be off task at work more than one hour in an eight-hour workday, Dr. Kellam responded "probably," but also noted that his treatment "really has not addressed this." *Id.* Dr. Kellam opined that plaintiff could not work full-time five days per week, but also opined that she could sit four hours and stand or walk four hours during an eight-hour workday. R. 710. He opined that plaintiff could occasionally lift up to 25 pounds, but never lift more than that at work. *Id.* He also opined that plaintiff was mildly restricted around moving machinery and driving, moderately restricted as to environmental extremes and pulmonary irritants, and totally restricted as to unprotected heights. R. 711.

### 4. *Treatment Records from Sentara Health*

As discussed above, on February 9, 2018, plaintiff underwent a procedure at the Sentara Heart Hospital to close the PFO in her heart. R. 324–31. This revealed a 10–11mm opening in the heart wall, which surgeons successfully closed using a septal occluder device. R. 327. Discharge occurred the next day. R. 329–31. Treatment notes indicate that plaintiff "has done

14

well [after her stroke] without residual deficits." R. 325. Follow-up echocardiograms on March 9 and October 8, 2018, found the PFO closure device to be working. R. 318–19, 321–22 (both describing plaintiff as doing "well"). On March 9, 2018, plaintiff denied having any dizziness, lightheadedness, syncope, chest pain, palpitations, shortness of breath, orthopnea, or swelling. R. 322. On the latter visit, plaintiff requested a second neurology opinion and received a referral to discuss her medical regimen. R. 319.

On February 20, 2019, plaintiff presented at Sentara Neurology Specialists complaining of post-stroke headaches, dizziness, numbness, memory loss, and Dr. Paschall's refusal to take her complaints seriously. R. 312, 314. Regarding the July 2018 seizure episode noted above, plaintiff reported no further episodes of being unable to recognize others, but described ongoing, brief, repeated, weekly episodes of being unable to "make sense of what is going on around her" in the presence of loud environmental stimuli. R. 314. Plaintiff reported occasional balance problems and infrequent difficulty finding words, but denied lightheadedness, dizziness, weakness, or trouble understanding speech. R. 314–15. Although reporting a history of migraines dating back to teenage years, plaintiff reported having constant, post-stroke headaches of fluctuating severity that never fully resolved. R. 314. These involve aching and throbbing pain in the right temporal-occipital region, with associated nausea and occasional blurred vision. *Id.* Plaintiff denied associated photophobia, sonophobia, and osmophobia. *Id.* Plaintiff also reported intermittent numbness in several fingers in her right hand, but denied having it elsewhere. *Id.* Finally, she reported taking medication for anxiety and as yet uncontrolled depression. R. 315.

Examination revealed, among other things: (1) a normal affect; (2) fluent and appropriate speech and comprehension; (3) an alert and well-oriented mental status; (4) normal cranial nerve function; (5) normal muscle tone, strength, and reflexes; (6) normal sensation, other than for

reduced touch sensation in the right upper and lower extremities, a positive Tinel's test and Phalen's sign at the right wrist; (7) normal cerebellar and coordination exams; and (8) normal gait and station. R. 316–17. Under the supervision of Dr. Daniel Cohen, physician's assistant ("PA") Lindsay Howe assessed plaintiff with, among other things: (1) a prior cerebrovascular accident; (2) daily headaches, with a plan to wean plaintiff off topiramate to see if this helps with memory issues, to start on amitriptyline for headaches, to reduce overuse of analgesics that were likely causing rebound headaches, to treat with a Medrol dose pack to break the headache cycle, and to reduce Fioricet usage to no more than two days per week; and (3) seizure-like activity and right-hand numbness, with a plan to order another brain MRI, an EEG, and to continue plaintiff's current seizure medication. R. 312–13.

On March 7 and 8, 2019, plaintiff wore an ambulatory EEG device for 24 hours and the results were read and assessed as normal. R. 310–11.

On March 27, 2019, plaintiff followed up with PA Howe and Dr. Cohen. R. 301–08. Plaintiff voiced similar complaints, as well as arm numbness, mood swings, and hot flashes, and the results of examination were likewise similar. R. 302–03. Physical and mental status exams again yielded mostly normal results, other than some reduced sensation in the right upper and lower extremities. R. 306. Plaintiff reportedly stopped taking amitriptyline due to hot flashes and continued taking topiramate and analgesics (ibuprofen) for headaches. R. 303. PA Howe substituted Aimovig injections for the amitriptyline and again directed plaintiff to stop using ibuprofen, to wean off topiramate, and to take Fioricet no more than three days per week. R. 302; see R. 304 (noting memory side effects of topiramate). Based partly on the results of March 8, 2019 MRIs, PA Howe suspected that plaintiff's right hand/arm numbness resulted from carpal tunnel syndrome, rather than the prior stroke, and prescribed a volar wrist splint along with follow-

16

up in four months.[7]  R. 302–03.

On April 8, 2019, a yearly follow-up and echocardiogram at Sentara Heart Hospital revealed that plaintiff was "doing well" and that the implanted occluder device remained in place. R. 299.  Plaintiff reported having palpitations one to two times per week, but without any lightheadedness, dizziness, headaches, or diaphoresis.  R. 299 (also noting migraines not related to palpitations).  Plaintiff also reported menopausal symptoms, but denied having syncope, angina, shortness of breath, orthopnea, swelling, as well as the other symptoms previously noted.  *Id.*  The treating PA prescribed a 14-day heart monitor (Zio patch).  R. 298–99.  Results of the ensuing, brief monitoring, before removal due to skin irritation, were normal.  R. 282.

On May 2, 2019, Dr. John Herre evaluated plaintiff at Sentara Norfolk General Hospital for complaints of heart failure.  R. 291–92.  Dr. Here reviewed plaintiff's prior invasive and non-invasive studies, ordered a cardiac MRI, and right and left heart catheterization study.  R. 292. The impressions from the catheterization on June 11, 2019 were stated as "[n]ormal [h]emodynamics\output [and] [n]ormal [c]oronaries."  R. 290–91.  A cardiac MRI in June 2019 confirmed plaintiff's Ebstein's anomaly and moderate to severe tricuspid regurgitation.  R. 282.

On August 1, 2019, plaintiff followed up with PA Howe at Sentara Neurology Specialists. R. 280.  Plaintiff reported some initial headache relief on Aimovig, which reduced her migraine frequency to three to four days per month, before daily headaches returned in June 2019.  R. 282. PA Howe assessed the headaches as likely related to stress, poor sleep, and continued overuse of analgesics, prescribed an increased dose of injectable Aimovig, continued use of Fioricet, and directed limiting use of analgesics.  R. 281.  PA Howe continued plaintiff's prior seizure

---

[7] The MRIs found no evidence of acute intracranial abnormality, but observed that the brain exhibited "sequela of remote [right middle cerebral artery] infarct with gliosis," in the area of plaintiff's prior stroke in 2017.  R. 302, 307.

medication. *Id.* She noted that Dr. Herre was following plaintiff's tricuspid valve insufficiency. *Id.* PA Howe directed use of prolonged cardiac rhythm monitoring with a Zio patch, to evaluate plaintiff's reported intermittent shortness of breath, fatigue, and continuing episodes of disorientation in the presence of loud noises. R. 281–83. On September 3, 2019, plaintiff reported by telephone that she was "doing well" and that her headaches were "much better" with the increased Aimovig dosage. R. 279.

Plaintiff's next followed up with PA Howe on December 11, 2019. R. 270. Plaintiff reported substantial improvement (80-90%) in headache severity, but continued daily symptoms including "throbbing or pounding" pain on either the left or right. R. 270–71. PA Howe increased plaintiff's dosage of carbamazepine, prescribed naratriptan as a substitute for Fioricet, and gave occipital nerve block injections for headache relief. *Id.* Although plaintiff disclaimed any further seizure episodes, PA Howe recommended weaning plaintiff off Keppra to address possible side effects of mood changes and forgetfulness. R. 270. PA Howe also ordered a sleep study to assess plaintiff's complaints of insomnia. R. 270–71.

On February 25, 2020, plaintiff received another round of neve block injections. R. 664–65. She reported continuing posterior headaches, due to excessive home stress, but described them as less severe and frequent after starting Aimovig injections. R. 664.

On April 22, 2020, plaintiff told PA Howe that the nerve block injections had yet to provide any noticeable relief. R. 654–55 (describing an ongoing, three-week long migraine and refusal to go to the emergency room due to COVID). Plaintiff denied having any further stroke-like symptoms or "spells" associated with seizures. R. 655. PA Howe maintained the existing treatment regimen, along with a tapered dose of steroids to break the current headache cycle, recommend weaning off short-term analgesics and an additional nerve block injection, and referred

18

plaintiff to a headache subspecialty team. R. 654–655. On May 7, 2020, plaintiff received another round of nerve block injections. R. 651–52.

### 5.    *Opinions of State Agency Experts*

As to plaintiff's physical RFC, Bert Spetzler, M.D., opined on initial review that she could: (1) occasionally to frequently lift and/or carry 10 pounds; (2) stand and/or walk, as well as sit, roughly six hours in an eight-hour workday; (3) push and/or pull without limits, aside from those identified for lifting and carrying; (4) occasionally climb stairs, stoop, and crawl, but never climb ladders and the like; (5) balance, crouch, and kneel without limits; (6) work in various environments without noise limits, but must avoid concentrated exposure to wet, humid, vibrating, dusty, and very cold or hot environments, and avoid even moderate exposure to workplace hazards. R. 76–77. He also opined that plaintiff had no manipulative, visual, or communicative limitations. R. 77. Dr. Spetzler explained that plaintiff's cardiac condition was stable without arrhythmias and she had no neurologic deficits, but limited her to light work, due to obesity, anxiety, and a history of seizures. R. 78.

On reconsideration, Michael Koch, M.D., provided similar opinions. R. 92–94. He differed from Dr. Spetzler, however, in opining that plaintiff: (1) could stand and/or walk just two hours during a workday; (2) could occasionally climb ladders and the like, kneel, and crouch; (3) could frequently balance; (4) had no limits with exposure to wetness; and (5) need only avoid concentrated exposure to workplace hazards. R. 93.

As to plaintiff's mental RFC, Andrew Bockner, M.D., opined on initial review that her mental status was normal, but that her anxiety and reported memory loss probably resulted from lack of concentration and attention due to anxiety. R. 79. While also noting that plaintiff has headaches, Dr. Bockner opined that stress factors cause plaintiff's anxiety symptoms and resulted,

at times, in a depressed mood. *Id.* Nevertheless, he opined that plaintiff could perform simple, routine work tasks, with some limitations in sustaining concentration. R. 79–80. Dr. Bockner found plaintiff: (1) not significantly limited in understanding and memory; (2) not significantly to moderately limited as to sustained concentration and persistence; (3) not significantly to moderately limited in social interaction; and (4) had no adaptation limitations. R. 79–80.

On reconsideration, Howard S. Leizer, Ph.D., found that plaintiff's only medically determinable mental health impairment was anxiety and that she had no more than mild limitations in each domain of mental health functioning. R. 90.

### III.   THE ALJ'S DECISION

To evaluate plaintiff's claim of disability,[8] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). The ALJ considered whether plaintiff: (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work given her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 15–29.

---

[8] To qualify for disability insurance benefits, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

First, the ALJ determined that plaintiff met the insured requirements[9] of the Social Security

Act through December 31, 2023, and had not engaged in substantial gainful activity from January

1, 2019, the alleged onset date of disability, through May 6, 2021. R. 18, 29.

At steps two and three, the ALJ found that plaintiff's migraines, obesity, anxiety, and

congenital heart disease with a history of cerebrovascular accident and seizure constituted severe

impairments. R. 18. The ALJ classified plaintiff's other impairments as non-severe. *Id*. The ALJ

further determined that plaintiff's severe impairments, either singly or in combination, failed to

meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt.

P, App. 1, as required for a finding of disability at step three. R. 18–21.

The ALJ next found that plaintiff possessed the RFC to perform less than a full range of

sedentary work. R. 21–27. The ALJ also specified the following additional limitations:

> the claimant has to avoid crawling and climbing ladders, ropes and scaffolds, but
> she can perform other postural movements occasionally; . . . is limited to simple,
> routine, low stress tasks, with low stress defined as requiring work with no more
> than occasional change in the routine, and work that allows her to avoid fast-paced
> tasks, such as assembly line jobs involving production quotas; . . . is limited to
> occasional interaction with the public and coworkers; . . . is limited to frequent
> fingering, grasping, handling, and reaching; . . . has to avoid working around
> hazards such as moving dangerous machinery and unprotected heights; . . . has to
> avoid concentrated exposure to respiratory irritants and extreme temperatures and
> humidity; and . . . has to avoid brightly lit and noisy work environments, but office
> level noise and lighting are okay.

R. 21.

At step four, the ALJ decided, based upon the VE's testimony, that plaintiff could not

return to her past relevant work as a teacher's aide/assistant or as a server. R. 27.

---

[9] In order to qualify for DIB, an individual must also establish a disability that commenced on or
before the last day in which that individual met the insured status requirements of the Social
Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

Having reviewed the DOT and the VE's testimony, at step five the ALJ concluded that plaintiff could perform existing jobs in the national economy, such as by working as a non-postal mail sort clerk/addresser, toy stuffer, or surveillance system monitor. R. 27–28.

Accordingly, the ALJ concluded plaintiff was not under a disability from January 1, 2019 through May 6, 2021, and was ineligible for disability benefits. R. 28–29.

### IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Johnson*, 434 F. 3d at 653.  "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).  The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829

F.2d 514, 517 (4th Cir. 1987). Thus, reversing the denial of benefits is appropriate only if either (a) the record is devoid of substantial evidence supporting the ALJ's determination, or (b) the ALJ made an error of law. *Id.*

## V.   <u>ANALYSIS</u>

***Substantial evidence supports the ALJ's conclusion that Dr. Kellam's opinions were unpersuasive and the ALJ followed proper procedure in reaching that decision.***

Plaintiff seeks a remand arguing that the ALJ improperly evaluated the opinions in Dr. Kellam's medical source statement. Pl.'s Mem. 10. First, plaintiff argues that the ALJ's finding that Dr. Kellam's opinions lacked support was wholly conclusory, contrary to regulation and without sufficient explanation to permit judicial review. *Id.* at 10–11; *see* 20 C.F.R. § 404.1520c(b)(2). Second, plaintiff argues that the ALJ's finding that Dr. Kellam's opinions were inconsistent with the record rests upon a selective and incomplete review of the record that ignores other evidence showing that plaintiff's conditions persisted, if not worsened, after her alleged onset date of disability. Pl.'s Mem. 11–13. A proper analysis of Dr. Kellam's opinions relative to the VE's testimony that being off task 15% or more of the time would be work preclusive, plaintiff argues, demonstrates that the ALJ's errors were not harmless. *Id.* at 14.

The Commissioner contends that substantial evidence supports, and that the ALJ correctly explained why Dr. Kellam's opinions were not persuasive. Mem. in Supp. of Def.'s Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 13, at 18–22. The Commissioner asserts that the ALJ analyzed the opinions for supportability and consistency "collectively." *Id.* at 19. As for supportability, the Commissioner asserts that the ALJ correctly deemed Dr. Kellam's opinions to be contradictory, finding for example that plaintiff could not work due to fatigue, but simultaneously finding her able to sit up to four hours in a workday, and stand/walk up to four hours in a workday. *Id.* at 18. The Commissioner also argues that the ALJ

properly addressed supportability when he used "Dr. Kell[a]m's treatment records to explain why [his] opinion was inconsistent with the record as a whole." *Id.* at 20–21. The Commissioner also argues that the ALJ correctly explained why Dr. Kellam's opinions were inconsistent with the record, "including [his] own treatment records," by reviewing all of the record and noting plaintiff's improvement over time, her recoveries from stroke and C-section, her "mostly normal/mild/moderate findings" thereafter, and her conservative treatment regimen. *Id.* at 18–19, 21–22. Based on such analysis, and the ALJ's explicit rejection of any finding that plaintiff would be off task 15% or more of the time, the Commissioner requests that the ALJ's decision be affirmed. *Id.* at 22.

### 1.   *The applicable methodology for reviewing Dr. Kellam's opinions.*

The SSA revised its evidence rules for claims, like plaintiff's, filed on or after March 27, 2017. 82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132 (Mar. 27, 2017) (correcting technical errors in final rule). Under such rules, an ALJ must consider and explain the persuasiveness of each medical opinion in the record.[10] 20 C.F.R. § 404.1520c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content of medical opinions and less on weighing treating relationships against each other"). ALJ review of medical opinions and findings now is based upon:  (1) supportability, or the relevance and strength of explanations for the opinion; (2) consistency, or the similarity with other opinions; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the relationship, and extent of the relationship; (4) specialization, relating to the training of the

---

[10] A "medical opinion" is a statement from a medical source about a claimant's limitations and ability to perform physical, mental, and other work demands, and to adapt to a workplace environment, in spite of her impairments. 20 C.F.R. § 404.1513(a)(2)(i)–(iv).

source; and (5) other factors, including but not limited to the source's familiarity with other medical evidence and the SSA's policies and requirements. 20 C.F.R. § 404.1520c(a), (c).

In assessing persuasiveness, however, an ALJ's chief task is to decide and explain whether an opinion or finding is supported by and consistent with the record.[11] *Id.* § 404.1520c(b)(2), (c)(1)–(2); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important factors"). Explanation about the remaining factors is only required when an ALJ concludes that two or more medical opinions are equally supported by and consistent with the record. 20 C.F.R. § 404.1520c(b)(3). Moreover, the rules dictate review of a provider's opinions on a collective basis, rather than opinion-by-opinion; negating the need for individual treatment of every medical opinion in the record. *Id.* § 404.1520c(b)(1). This framework guides the Court's review below.

### 2.     *The ALJ committed no error in evaluating Dr. Kellam's opinions.*

#### a.     *Supportability*

The supportability of Dr. Kellam's medical opinions turns, in significant part, upon their relationship with any supporting explanation he provided, as well as upon whether the opinions align with and are derived from relevant objective medical evidence. *See* 20 C.F.R. § 404.1520c(c)(1). Unfortunately, Dr. Kellam provided no supporting explanation. R. 709 (declining to specify any observations, findings, and testing supporting his opinions because they were "[t]oo numerous to mention here"). This leaves Dr. Kellam's opinions about plaintiff's functional limitations, including her inability to focus and stay on task 50% of the time due to fatigue-induced concentration and memory issues, *see id.*, unconnected to any findings and tests

---

[11] Supportability is an internal review that requires an ALJ to consider how "objective medical evidence and supporting explanations presented by a medical source . . . support his or her medical opinions." 20 C.F.R. § 404.1520c(c)(1). By comparison, consistency is an external review that requires an ALJ to determine how "consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . ." Id. § 404.1520c(c)(2).

arising from treatment. This, in turn, left the ALJ with little to nothing to discuss aside from Dr. Kellam's bald conclusion that plaintiff could not perform full-time work. R. 710. That determination, however, is a matter reserved for the Commissioner, rather than a medical source. *See Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 356 (4th Cir. 2023) (citing 20 C.F.R. § 404.1527(d)). Accordingly, the Court rejects plaintiff's complaints about the adequacy of the ALJ's explanation for why Dr. Kellam's opinions lacked support, Pl.'s Mem. 10, because the bare-boned and conclusory opinions did not lend themselves to meaningful review.

Further, the foregoing absence of explanation is compounded by the uncertain and internally contradictory nature of Dr. Kellam's opinions, as discussed by the ALJ. *See* R. 26. For example, although asserting that plaintiff's constant fatigue precludes work, Dr. Kellam also opined that she remains able to sit for up to four hours and stand or walk up to four hours during an eight-hour workday, as well as occasionally lift roughly 20 pounds. R. 26, 709–10. Having concluded that plaintiff possesses the wherewithal to sometimes lift relatively heavy items and to sit, walk, and stand for a total of eight hours, at least on one workday, Dr. Kellam nowhere explicitly addressed whether or why plaintiff would be unable to do so throughout the workweek. The absence of explanation makes it difficult to reconcile these opinions. Similarly, and as observed by the ALJ, while implicitly opining that plaintiff could focus and stay on task at least 50% of each workday, Dr. Kellam also expressed uncertainty about whether she would need extra rest breaks such that she would be off task more than one hour during an eight-hour workday. R. 709 (noting as to the latter, "probably" but he "really has not addressed this"). Likewise, and as observed by the ALJ, Dr. Kellam simultaneously opined plaintiff has no need for bedrest due to fatigue or pain such that she would be periodically unable to report to work. *Id.* These internal

26

contradictions and Dr. Kellam's uncertainty about plaintiff's need for rest breaks detract from the supportability and persuasive impact of his opinions, as discussed by the ALJ.[12]

Beyond these shortcomings, the ALJ also compared Dr. Kellam's opinions with his findings and test results (as well as with those of other providers). R. 26. Here, as the Commissioner acknowledges, the ALJ addressed supportability and consistency "collectively." Def.'s Mem. 19. Although less than ideal, this method of analysis is permissible, provided that the path of the ALJ's reasoning can be traced. *See Brenda L.R. v. Kijakazi*, No. 3:21cv144, 2022 WL 3500202, at *5 (E.D. Va. June 21, 2022), *report and recommendation adopted*, 2022 WL 3448039 (E.D. Va. Aug. 17, 2022) (an ALJ "need not necessarily use the words 'supportability' or 'consistency,' as long as the ALJ still performs the requisite analysis of these factors" and a reviewing court can discern the ALJ's reasoning).

On this score, the ALJ repeatedly and generally cited Dr. Kellam's treatment records (and those of other providers) in discussing why his opinions were not persuasive. *See* R. 26. Citing to exhibits 1F, 5F, and 10F – Dr. Kellam's treatment records – the ALJ described Dr. Kellam's opinion that plaintiff could only remain on task 50% of the workday as being at odds with ("inconsistent") with plaintiff's improving symptoms and psychiatric and neurological findings during examinations. R. 23–24, 26; *see* R. 480, 497, 501, 547, 716, 720, 725 (listing Dr. Kellam's mostly unremarkable psychiatric and neurologic findings). Indeed, with respect to plaintiff's psychiatric status, Dr. Kellam typically noted no more than mild to moderate anxiety, *see* R. 480,

---

[12] As correctly noted by plaintiff, Pl.'s Reply Mem. ("Pl.'s Reply Mem."), ECF No. 14, at 2–3, the Commissioner's contention that Dr. Kellam's opinions are "internally inconsistent" conflates the concepts of supportability and consistency. *See* Def.'s Mem. 18 (also arguing that the ALJ "addressed consistency by noting where Dr. Kellam's opinion was inconsistent with . . . [his] own treatment records"). Similarly, plaintiff's criticism that the ALJ "needlessly confused" the analysis by simultaneously referencing and citing to internal and external record evidence has some merit. *See* R. 26. In spite of this, the ALJ's reasoning is sufficiently clear to permit judicial review.

497, 501, 547, 716, 720, 725, for which he prescribed and noted that plaintiff "takes the occasional Xanax" for understandable anxiety due to health issues, R. 716, 725. Based partly upon these records, the ALJ reasonably found plaintiff's anxiety to be situational and only mild to moderate. R. 24.

On the physical side, Dr. Kellam's source statement lists only diagnoses for Ebstein's anomaly, tachycardia events, and a cerebrovascular accident (stroke). R. 709. With respect to the plaintiff's stroke and the serious, cascading events post-childbirth, the ALJ relied upon Dr. Kellam's treatment notes in finding that plaintiff had recovered from the stroke and the post-birth events and procedures. R. 24, 26 (citing exhibit 10F; *see* R. 716, 725); *see also* R. 24 (discussing recoveries and single episode of seizure-like activity before alleged onset date). In further discussing plaintiff's congenital heart and stroke and seizure issues, among other things, the ALJ observed that treatments (including Dr. Kellam's) in the pertinent timeframe "indicate mostly normal[,] mild/moderate findings overall." R. 26 (citing to, among other things, exhibits 5F and 10F).

With respect to Dr. Kellam, these include findings within those exhibits of: (1) no acute cardiopulmonary processes, R. 502; (2) "favorable" cardiac catheterization results, R. 494; (3) normal cardiovascular results, R. 497; (4) the absence of significant arrhythmias, R. 486; (5) a very mild Ebstein's anomaly in need of no intervention, R. 486, 725; (6) "favorable" echocardiogram and heart monitoring results, R. 480–82; (7) the absence of "major issues" with tachycardia, aside from relatively benign episodes, R. 481, 716; (8) a heart rhythm controlled with medication, R. 716; and (9) "mild" cardiovascular symptoms, with "plenty of dyspnea on exertion" and occasional palpitations, "but none that [are] disabling," R. 719. These findings align with the ALJ's

determination that the evidence failed to support plaintiff's "alleged loss of functioning," R. 24, far more than with Dr. Kellam's opinion about a fatigue-induced inability to work.

Mirroring the findings in these treatment records generally cited to by the ALJ, Dr. Kellam himself described plaintiff as: (1) "doing relatively well," R. 497 (October 21, 2019); (2) having lots of anxieties that are "well controlled" with her non-abusive use of Xanax, R. 725 (November 12, 2020); (3) having "done well with her general circumstances with only mild dyspnea on exertion," without further strokes or TIAs, R. 725 (November 12, 2020); and (4) having "done well overall," R. 716, 720, 724 (February 4, 2021). As noted by the ALJ, the foregoing assessments and findings run counter to and cast substantial doubt upon Dr. Kellam's unexplained opinions that plaintiff cannot work due to fatigue resulting from her prior stroke, tachycardia, and Ebstein's anomaly. Thus, the ALJ's assertion that Dr. Kellam's opinions were not supported by the evidence of record rests upon a solid foundation. *See* R. 26.

### b. *Consistency*

Substantial evidence also supports the ALJ's determination that Dr. Kellam's opinions about plaintiff's fatigue and its effects were inconsistent with the record as a whole. *Id.* Although plaintiff reported bouts of fatigue and associated concentration and memory issues, these symptoms mostly failed to substantially manifest themselves in the objective physical and mental status exam findings of other providers. R. 24 (citing "mostly normal/mild/moderate findings overall"); *see* R. 274, 284–85, 294–95, 299–300, 306, 316–17, 523, 540, 680–81. As noted by the ALJ, these findings were consistent with testing and findings that: (1) plaintiff had no residual neurologic deficits after her stroke in November 2017; R. 23 (R. 247, 263); (2) plaintiff had only one episode of seizure-like activity with speech disturbance and confusion, in July 2018 before the alleged onset date; R. 23, 26 (R. 523 (mostly normal exam findings two days later)); and (3)

29

plaintiff could be promptly discharged and resume normal activities as able following a possible TIA in January 2021, in light of normal CT exams and the lack of any of neurologic deficits; R. 24 (R. 671).

Although Dr. Kellam did not attribute plaintiff's fatigue and associated effects to any diagnosis for headaches, the ALJ also nevertheless observed that his opinion about plaintiff's inability to stay on task more than 50% of a workday was inconsistent with the progress observed in treating her headaches. R. 26. Although plaintiff's headaches never fully resolved, the record supports the ALJ's conclusion that "fairly conservative treatment, including injections," caused her migraines to improve. *Id.* (R. 270–71 (reporting 80–90% improvement and weaning off seizure medication to address possible mood and memory side effects)); 279 (headaches "much better" with increased dose); 281–82 (noting some headache relief due to medication and attributing remaining headaches to stress and sleep issues and lack of compliance); 302–04 (reminding plaintiff to cease use of analgesics and topiramate, due to headache and memory side effects); 312–13 (attributing rebound headaches to overuse of analgesics and weaning off topiramate to address possible memory side effects); 664 (headaches due to stress, but reduced in frequency and severity); 654–55 (noting lengthy, ongoing migraine, directing discontinued use of analgesics, and referral to headache team).

Similarly, although Dr. Kellam did not attribute any of his opinions to mental health diagnoses, the ALJ observed that his off task opinion was also inconsistent with psychiatric findings during examinations, as previously detailed above. R. 26. Also, as noted by the ALJ, it is undisputed that plaintiff never received psychiatric hospitalizations, emergency psychiatric treatment, or other psychiatric treatment for anxiety. R. 24–26. Notably, as the sole provider treating plaintiff for anxiety and occasionally prescribing Xanax for the same, Dr. Kellam's

decisions not to link his opinions about plaintiff's limitations to anxiety and not to issue a mental health referral track well with the ALJ's conclusion that plaintiff's anxiety was "situational," "mild to moderate," and could be addressed with appropriate RFC limitations. R. 26.

Finally, the apparent disconnect between Dr. Kellam's opinions about plaintiff's inability to work relative to the favorable findings and test results for the three diagnosed impairments in his source statement suggests that Dr. Kellam credited plaintiff's self-reported symptoms more than the ALJ. In rejecting Dr. Kellam's off task opinion, the ALJ relied, in part, upon plaintiff's improving symptoms and his weighing of her testimony. *Id.* After a lengthy summary of that testimony, the ALJ characterized it as "inconsistent with" and "not well supported" by evidence in the record. R. 25 (stating that claimant's symptoms "exceed the findings contained in the medical records"). This decision by the ALJ finds ample support in the record.

This leaves plaintiff's arguments that her impairments had either persisted or worsened after January 2019 and that the ALJ cherry-picked the record for normal and favorable findings and ignored unfavorable ones in discounting Dr. Kellam's opinions. Pl.'s Mem. 10–13. In citing to Dr. Kellam's treatment notes from October 2019, February 2020, and February 2021, *id.* at 12–13, however, plaintiff attempts to engage in the very task that Dr. Kellam declined to perform, namely, to explain how his findings and tests lead to his opinions.[13] Given the sizeable gaps and inconsistencies between them, any such explanation needs to come from the cardiologist himself, rather than plaintiff's counsel.

---

[13] Ironically, having criticized the ALJ and the Commissioner for confusing the required analysis, plaintiff's invitation to scrutinize Dr. Kellam's treatment notes in attacking the ALJ's allegedly cherry-picked, consistency analysis, Pl.'s Mem. 11, arguably takes the Court away from the consideration of the relation between Dr. Kellam's *opinions* and *other medical and non-medical evidence*. Nevertheless, the Court will endeavor to address plaintiff's challenge.

Several examples show why this is so. Contrary to claims that the ALJ ignored evidence from February 4, 2021 that plaintiff's condition had not improved, *id.* at 11, 13, the ALJ discussed Dr. Kellam's February 4, 2021 progress notes and recited, among other things, her history of Ebstein's anomaly, tachycardia, heart issues, and moderate anxiety. R. 24, 26, 716. The ALJ also recited Dr. Kellam's bottom line finding that plaintiff "has done well overall." R. 716; *see* R. 719 (describing plaintiff's cardiovascular symptoms as "mild"). Although the ALJ did not discuss plaintiff's subjective complaints (forgetfulness, memory, attentiveness, etc.) from that visit, *see* R. 719, the ALJ already recounted similar concerns in describing plaintiff's testimony, R. 22. Therefore, no need existed to repeat them or again detail her cardiac treatment history.

Plaintiff correctly notes that the ALJ did not discuss a nurse's note about an April 15, 2019 echocardiogram showing severe tricuspid regurgitation and a diluted right atrium and ventricle, R. 499. *See* Pl.'s Mem. 12. This, however, preceded Dr. Kellam's expert, February 2020 assessments that plaintiff's echocardiogram results were "favorable" and that a heart monitor revealed "no major issues," R. 480–82, and his February 2021 finding of only "mild" cardiovascular symptoms, R. 719. Moreover, when Dr. Kellam sent plaintiff to a specialist at Johns Hopkins to evaluate the very tricuspid regurgitation that plaintiff deems significant, he found only a "very mild" Ebstein's anomaly with "no major functional impairment" and a closed PFO with no "active arrhythmias in need of intervention." R. 482, 725. Therefore, in arguing that the ALJ omitted various negative details from Dr. Kellam's treatment notes, Pl.'s Mem. 11–13, plaintiff appears to be missing the forest, recognized by the ALJ, for the trees.[14]

---

[14] The same is true for plaintiff's complaints about the ALJ's limited discussion of her October 21, 2019 visit with Dr. Kellam, as well as her January 2021 visit to the emergency room, as discussed above. *See* Pl.'s Mem. 12–13; R. 23–24. To his credit, Dr. Kellam attempted to discern and largely ruled out cardiovascular causes for plaintiff's complaints. Having noted the normal to moderate findings stemming from such efforts, the ALJ need not have reviewed and/or repeated the

Plaintiff also argues that the ALJ erred by indicating that her migraines had improved due to the nerve block injections, including on May 7, 2020, when, in fact, they offered only short-term relief and the headaches continued to recur. Pl.'s Mem. 13. In reciting the May 7, 2020 treatment, however, the ALJ noted only that plaintiff tolerated the procedure well and had no complications. R. 24. Indeed, the ALJ never asserted that plaintiff's headaches had fully abated; instead reciting only that they had "improved overall," as discussed above, with "fairly conservative treatment, including injections." R. 25–26. Because the noted improvement (as discussed above) mostly related to monthly injections of Aimovig rather than Botox nerve blocks, R. 270–71, 279, the ALJ's statement appears to be accurate, even if perhaps somewhat unclear.

For these reasons, plaintiff's claim of cherry-picking the record fails to survive close scrutiny. Similarly, the record contains ample evidence supporting the ALJ's view that plaintiff's symptoms had improved. The ALJ's determination that Dr. Kellam's unexplained opinions were inconsistent with the record as a whole, including the opinions of state agency experts, is well supported. Accordingly, substantial evidence supports the ALJ's analysis of Dr. Kellam's opinions, which analysis complied with the metrics supplied in 20 C.F.R. § 404.1520c.

## VI.   <u>RECOMMENDATION</u>

For all these reasons, the Court recommends that plaintiff's motion for summary judgment (ECF No. 10) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 12) be **GRANTED**.

---

repeated the complaints that testing and objective exams mostly failed to substantiate. *See* R. 497 (describing plaintiff as "doing relatively well," but directing use of monitor to see if arrhythmias played a role in the neurologic issues recited by plaintiff). Similarly, having noted plaintiff's primary complaints and the findings from the January 2021 hospital visit, the ALJ need not have done anything more.

## VII.   REVIEW PROCEDURE

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

/s/
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
April 25, 2023

34